JINHUA YANG and JINGTAO XIE, as
Guardians Ad Litem and Parents
of Minor JIAQI XIE,

             Plaintiffs,

      v.

THE BOEING COMPANY,

             Defendant.

Case No. 13 C 6846;
related to
Case Nos. 13 C 7418;
13 C 7421; 13 C 7422;
13 C 7424; 13 C 7428;
13 C 7432; 13 C 7434

Hon. Harry D. Leinenweber

**MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiffs' Motions to Remand. For the reasons stated herein, the Motions are granted.

### I. BACKGROUND

These cases arise out of the July 6, 2013 crash of Asiana Airlines Flight 214 into the seawall at San Francisco International Airport ("SFO"). They are consolidated for purposes of the Motions to Remand.

Flight 214 carried 291 passengers and 16 crew members from Seoul, South Korea to San Francisco, California. Nearly all of the eleven-hour flight occurred over the Pacific Ocean. At the end of the flight, the aircraft was approaching SFO on a planned seventeen-mile, straight-in approach over the San Francisco Bay (the "Bay"). At SFO, the water and the runway are separated by a

seawall; the ground is level with the top of the seawall, and water level is some distance below.

On its approach, the plane was traveling too low and too slow. Just before the plane reached the runway, the landing gear got caught on the seawall, snapped apart from the plane, and fell into the Bay. A portion of the tail fell into the water as well. The plane skidded, out of control, onto the runway. Many passengers were injured, and three lost their lives.

The aircraft in question was a 777-200 jumbo jet manufactured by Defendant Boeing ("Boeing"). Of crucial importance for any aircraft is the certification process. The 777 was first certified by the Federal Aviation Administration (the "FAA") and entered commercial service in 1995. The 777-200 is a longer-range 777, also first produced and certified in 1995. The accident aircraft was delivered to Asiana in 2006.

Pursuant to its statutory authority, the FAA oversees the certification process but delegates many certification functions to private citizens who serve as "FAA delegates." The airplane involved in the accident was certified by Boeing employees who, while acting as FAA delegates, approved the aircraft as safe for flight. Defendant explains that the aircraft at issue was subjected to hundreds of different tests and certifications, all conducted under FAA supervision, before the airplane was certified as airworthy.

Plaintiffs were passengers on the plane and brought these lawsuits against Boeing alleging state law claims for product liability, negligence, and willful and wanton conduct. They contend that defectively designed systems – including the autothrottle, the flight control system, and the low airspeed warning – contributed to the accident. Defendant removed these cases to this federal court on two jurisdictional grounds: admiralty jurisdiction and federal officer jurisdiction. Plaintiffs now move to remand and argue that neither of these purported bases provides the Court with subject matter jurisdiction.

The remand motions pose difficult jurisdictional questions. In cases such as these, whether the Court has admiralty or federal officer jurisdiction can turn on details that are far removed from the merits of the case. The Court appreciates the excellent briefs provided by counsel for both sides.

## II.  ADMIRALTY JURISDICTION

Any civil action brought in state court can be removed to federal district court if the district court would have had original jurisdiction over the action. 28 U.S.C. § 1441(a). District courts have original jurisdiction over civil cases "of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). A party seeking to invoke federal admiralty jurisdiction over a tort claim "must satisfy conditions both of location and of connection with

maritime activity." *Grubhart v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 534 (1995). To fulfill the location requirement, the tort must have occurred on navigable water, or if the injury was suffered on land, it must have been caused by a vessel on navigable water. *Id.*

Historical cases illuminate what it means for a tort to occur on the water. In *Smith & Son v. Taylor,* the plaintiff represented a decedent who was standing on a wharf (considered an extension of land) and knocked into water by a sling operated from a ship. *Smith & Son v. Taylor,* 276 U.S. 179, 182 (1928). The tort occurred on land because "the blow by the sling was what gave rise to the cause of action," and that blow "was given and took effect while the deceased was upon the land." *Id.* In another case, *Minnie v. Port Huron Terminal Co.,* the Court was presented facts converse to *Taylor*. *Minnie v. Port Huron Terminal Co.,* 295 U.S. 647 (1935). In *Minnie,* the plaintiff was standing on a boat when he was struck by a crane that was operated on land. *Id.* at 647. Because the injury was due to the hit that plaintiff sustained while standing "on the vessel in navigable water," the tort occurred on the water and thus the court had admiralty jurisdiction. *Id.* at 648.

In neither case did it matter where the victim ended up after the tort – in fact, the *Taylor* decedent fell from the land to the water, while the *Minnie* plaintiff fell from the boat onto land. Similarly, it did not matter in *Taylor* that the negligence was

caused by a person on the water, nor did it matter in *Minnie* that the tort was caused by a person on land. These cases teach that the tort arises where and when the injury occurs, not where the victim ends up and not at the situs of the operative negligence. Courts today express this principle by explaining that, for the "locality" inquiry, "the tort 'occurs' where the alleged negligence took effect." *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio,* 409 U.S. 249, 266 (1972).

Even with the understanding that the tort occurs where the alleged negligence takes effect, courts have noted the difficulty inherent in fixing the location of an airplane crash without relying on the fortuity of whether a plane happened to crash into water or land. In *Executive Jet,* for example, the airplane struck a flock of birds on takeoff and suffered a nearly total loss of engine power. *Executive Jet,* 409 U.S. at 250. The semi-stalled plane descended, struck a portion of the airport's perimeter fence, and then settled in Lake Erie. *Id.* The court explained that "distinctions based on locality . . . entirely lose their significance where aircraft, which are not geographically restrained, are concerned." *Id.* at 266. In that court's view, the location inquiry cannot turn on whether the crashing plane happened to end up on land or in water. *Id.* The court declined to decide whether, on the facts of the case, the location element was satisfied, and resolved the case on other grounds. *Id.* at 267-68.

The *Belle Harbor* court did not have the luxury of deciding the case on other grounds, and took the location inquiry head-on. *In re Air Crash at Belle Harbor, New York,* MDL 1448, 2006 WL 1288298 (S.D.N.Y. May 9, 2006). That case arose out of the November 2001 crash of a commercial airplane just after takeoff from New York's John F. Kennedy airport. *Id.* at *2. Less than two minutes after takeoff, while the plane was over the waters of Jamaica Bay, the plane's vertical stabilizer separated in flight and fell into the water. *Id.* At that point, without a vertical stabilizer, "the Aircraft no longer was capable of flight." *Id.* The plane deteriorated further, as the engines broke apart from the wings and the fuselage pitched downward. *Id.* Moments later, the aircraft crashed into a residential neighborhood. *Id.*

The Court concluded that the tort occurred when the airplane lost its vertical stabilizer and rudder over Jamaica Bay. *Id.* at *12. It explained that "[f]rom that moment forward, the deaths of all those aboard the Aircraft were inevitable." *Id.* Because "the whole wrongful agency was put in motion and took effect over navigable water," the accident met the locality requirement for admiralty jurisdiction. *Id.* It did not matter that the passengers made impact with land, because that result was "totally fortuitous" for an out-of-control fuselage, and not the sort of factor that should determine the boundaries of federal admiralty jurisdiction. *Id.*

The *Belle Harbor* court relied on *The Strabo,* a case in which a worker was injured after he was thrown off a ship and landed on a dock. *The Strabo,* 98 F. 998, 999 (2d Cir. 1900). In that case, once the victim was thrown from the ship, he knew that he was "subjected to conditions inevitably resulting in physical injury, wherever he finally struck." *Id.* at 1000. The cause of action thus commenced on the ship from which he was thrown, and it was "not of vital importance" whether the worker fell onto land or water. *Id.*

This case differs from *Belle Harbor* and *The Strabo* in several important respects. Notably, this airplane was capable of flight up until the moment it made impact with the seawall. Unlike the doomed and out-of-control fuselage in *Belle Harbor,* and the victim in *The Strabo* who faced certain injury, this airplane was on a controlled path toward the runway and just made impact with the ground too soon. At no point before the crash was it inevitable that the plane would crash. For those injured in *Belle Harbor* and *The Strabo*, the tort was consummated at the point when injury was inevitable. The passengers on Flight 214 never faced inevitable injury, and thus their tort was consummated when the airplane struck the terrain. In addition, all of the injuries occurred on the ground after the airplane struck the terrain. There is no basis to say that the tort took effect at any point before the

plane struck the seawall. Thus, the tort occurred and "took effect" on land.

Defendant contends that, based on *Belle Harbor*, maritime locality is satisfied any time "the events causing the accident were set in motion over navigable water." Def.'s Opp. at 6 (emphasis removed). The "in motion" language appears in *Belle Harbor*, and is actually a quote from *The Strabo*. In both of those cases, the court focused on the point at which the tort was complete because the accident was inevitable. *Belle Harbor,* 2006 WL 1288298, at *12; *The Strabo,* 98 F. at 1000. That language does not support Defendant's contention that locality is satisfied whenever any event that causes the injury happens over water.

The better reading of those cases recognizes that locality is established when the tort is complete, and a tort arising out of a crash landing is complete either once the crash happens or once the crash is inevitable. Here, causal factors contributed to the crash at various times *before* the airplane struck the seawall, but there is no indication that those causal factors made the crash inevitable. Defendants have not cited any authority to support the idea that those "pre-inevitability" factors play a role in the admiralty locality analysis. Defendant cites to *Brown v. Eurocopter S.A.,* but that case supports remand because the court explained that the wrong was "consummated on the high seas" where the aircraft was over water when the aircraft "sustained a critical

loss of tail rotor control." *Brown v. Eurocopter S.A.,* 38
F.Supp.2d 515, 516-18 (S.D. Tex. 1999). An approach that is too
low and too slow is not the same as an uncontrollable plummet – and
that distinction is critical because it affects the point at which
the tort takes effect. In this case, the tort was neither
inevitable while the plane was over water nor completed when the
plane was over water.

Defendant argues that some passengers were aware that the
aircraft was coming in too low and slow just before the plane hit
the seawall. If the crash were inevitable, this awareness on the
part of the passengers could have fixed the time of injury as
before the plane hit the seawall. But, as explained above, this
crash was not inevitable, and the tort was not complete, until the
plane hit the seawall.

Finally, Defendant argues that when the plane crashed into the
seawall, many rows of seats were still over water. This detail is
not a basis for admiralty jurisdiction because it does not change
the fact that the tort was consummated when the airplane crashed
into land. The only parts of the airplane that touched the water
were the portions of the landing gear and the tail that broke off
and fell in after impact and separation from the rest of the plane.
No passenger touched the water, and no part of the plane touched
the water before it broke off from the portion of the plane that
still held all the passengers. The tort was consummated by impact

with land, and not even for the passengers in the plane's last row do the claims arising out of the crash fall within the Court's admiralty jurisdiction.

It is important to distinguish one superficial similarity between this case and *Belle Harbor:* in both cases, the flight was almost entirely over navigable water. The *Executive Jet* Court was concerned with not just the fortuity of where the airplane crash-lands, but also, for a flight that is partially over land and partially over water, the fortuity of whether the negligence takes place over water or land. For such a flight, jurisdiction should not "depend on whether the plane happened to be flying over land or water when the original impact of the alleged negligence occurred." *Executive Jet,* 409 U.S. at 267. Defendant appears to argue that this Court has jurisdiction because the airplane crashed just past the water, and it was mere chance that the plane did not crash in the water.

The Court acknowledges that, to a limited extent, the boundaries of this Court's admiralty jurisdiction are governed by the facts of the case, some of which are outside the control of the parties and the result of mere happenstance. But it is not enough to say that this Court should have admiralty jurisdiction just because the plane was near the water when it crashed, or because some pieces of the airplane fell into the water after the crash into land. The party seeking to invoke this Court's admiralty

jurisdiction must satisfy the Court that the tort took place on navigable water or was caused by a vessel on navigable water. *Grubhart,* 513 U.S. at 534. The result Defendant seeks would ignore the rule from *Grubhart* and contradict the reasoning in *Taylor* and *Minnie*. To put it simply, a crash into land cannot take place on navigable water unless that crash was inevitable while the plane was over water. Unlike in *Belle Harbor,* this crash did not become inevitable while the plane was over water. Accordingly, the Court lacks admiralty jurisdiction over these cases.

### III.  FEDERAL OFFICER JURISDICTION

Boeing asserts that this Court has jurisdiction under 28 U.S.C. § 1442(a)(1), which provides for removal in cases involving federal officers. Boeing must show it was a (1) "person"; (2) "acting under" the United States, its agencies, or its officers; (3) that has been sued "for or relating to any act under color of such office"; and (4) has a colorable federal defense. *Ruppel v. CBS Corp.,* 701 F.3d 1176, 1180-81 (7th Cir. 2012). Although the burden of proving federal jurisdiction under § 1442 is on the defendant, there is no presumption against federal officer jurisdiction or preference for remand; the Supreme Court has explained that "the policy favoring removal should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Arizona v. Manypenny,* 451 U.S. 232, 242 (1981).

The central issue raised by the pending Motion is whether Defendant was "acting under" the United States when it took the actions challenged in the Complaint. As the Supreme Court has explained, "the private person's 'acting under' must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Watson v. Philip Morris Cos.,* 551 U.S. 142, 152 (2007). The Court clarified that, when it comes to a private firm,

> compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under.' And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.

*Id.* at 153.

Production of airplanes is heavily regulated. Under the Federal Aviation Act, the Secretary of Transportation is tasked with promoting air travel safety by establishing minimum standards for aircraft design, materials, workmanship, construction, and performance. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 804 (1984). Through a multi-step certification process, airplanes are reviewed by the FAA and certified at no fewer than three distinct stages: (1) the "type" stage, where the plane's basic design is evaluated; (2) the "production" stage, where the manufacturer's quality control systems are scrutinized to ensure that each aircraft will meet the design provisions from the first stage; and (3) the "airworthiness"

stage, where the specific airplane is certified safe for flight. *Id.* at 805-06. Most importantly for the pending Motion, the Act and its implementing regulations empower the Secretary to appoint private individuals "to serve as designated engineering representatives to assist in the FAA certification process." 49 U.S.C. § 44702(d); 14 C.F.R. § 183.29.

Defendant explains that many of its employees are FAA delegates who acted pursuant to the Secretary's direction when they certified the airplane in question. Defendant avers, and the Court has no reason to doubt, that the 777 jumbo jet at issue here was subjected to hundreds of tests performed by Defendant's employees acting as delegated representatives of the FAA. In Defendant's view, the Court has federal officer jurisdiction because Plaintiff's allegations challenge the work of Defendant's employees who, in their capacity as federal officers, certified the plane as safe.

As an initial matter, private FAA delegates are treated as legally distinct from their employers. *West v. A&S Helicopters,* 751 F.Supp.2d 1104, 1109 (W.D. Mo. 2010). As the *West* court explained, "when employee-designees act in their capacity as designees, they are not the same legal entity as [their employer]." *Id.* Defendant cannot claim federal officer removal on the basis that it has employees who are designated FAA authorized agents.

Defendant argues that, nonetheless, the Court has federal officer jurisdiction because the Complaint, when read fairly, relies on various theories that Defendant's employees erred in the certification process while serving as the FAA's representatives. Defendant has submitted the declaration of Anngelique Bowen, who explains that actions taken by FAA delegates "are overseen by FAA certification engineers." No. 13 C 7418, Ex. C to Def.'s Notice of Removal, ¶ 3. In Defendant's view, the Court has jurisdiction because the process of manufacturing a jumbo jet is subject to intense regulatory scrutiny and Defendant's employees (who also serve as FAA delegates) worked with the FAA to ensure that the airplane met regulatory standards.

Federal courts have been presented with this situation before. In *Swanstrom v. Teledyne Continental Motors, Inc.,* 531 F.Supp.2d 1325, 1327-28 (S.D. Ala. 2008), an oft-cited case, the plaintiff brought suit against the aircraft's manufacturer after a crash. The manufacturer argued that it acted under the direction of a federal officer when its employees, acting as FAA delegates, conducted tests and prepared FAA certifications. *Id.* at 1331. The Court explained that whether a defendant is acting under the direction of a federal officer depends on the detail and specificity of the federal direction of the defendant's activities and whether the government exercises control over the defendant. *Id.* at 1331. In that case, the complaint failed to name as a

defendant any FAA authorized agent, and there was no indication that the FAA exercised substantial and direct control over the manufacturing process. *Id.* at 1332. The Court reasoned that even though "manufacturing an airplane and its parts is highly regulated by the FAA," the removal statute was not intended to allow any participant of a regulated industry to remove any case challenging regulated conduct. *Id.* Thus, the Court lacked jurisdiction under the federal officer removal statute.

A similar dispute arose in *Magnin v. Teledyne Continental Motors,* 91 F.3d 1424, 1426 (11th Cir. 1996). After a private plane crashed, the plaintiff sued the manufacturer of the airplane and one of the manufacturer's employees. *Id.* The plaintiff alleged that the defendants' negligent inspection and wrongful certification of the aircraft's engine was a proximate cause of the accident. *Id.* The complaint described the employee as "a designated manufacturing inspection representative (DMIR) that certified engines 'airworthy' or safe for exportation and installation on aircraft." *Id.* In the removal petition, the defendants averred that the employee, in his capacity as an FAA delegate, was "acting under an officer or agency of the United States . . . when he did the act for which he was sued." *Id.* at 1428. Removal was proper because the suit was brought against a federal officer challenging actions taken within the scope of his federal duties. *Id.*

Here, just as in *Swanstrom* but unlike in *Magnin,* Plaintiffs have sued the corporate manufacturer only, and not the employees responsible for certifying the plane. The Complaints in these cases seek damages for product liability and negligence, and do not challenge certification – again, just as in *Swanstrom* but unlike in *Magnin.*

In addition, the fact that the FAA oversees the work of Defendant's employees is not sufficient to show that the FAA controlled Defendant's day-to-day operations, which, as explained above, is required for federal officer jurisdiction under *Watson.* Ordinarily, "the FAA does not control the day-to-day operations of designated airworthiness representatives," nor does it "manage the details of a designated representative's work or supervise him in his daily investigative duties." *Charlima, Inc. v. United States,* 873 F.2d 1078, 1081 (8th Cir. 1989). The Declaration of Anngelique Bowen notes, consistent with the general rule, that delegates "are overseen by FAA certification engineers." No. 13 C 7418, Ex. C to Def.'s Notice of Removal, ¶ 3. But mere oversight is insufficient; just as in *Swanstrom,* there is no contract or agency relationship between Defendant and the FAA, nor was there "substantial and direct control" over the Defendant as a corporate entity. *Swanstrom,* 531 F.Supp.2d at 1331-32.

Defendant's reliance on *Scrogin v. Rolls-Royce Corp.,* No. 10 C 442, 2010 WL 3547706 (D. Conn. Aug. 16, 2010) is misplaced. In

that case, the three corporate defendants manufactured a specific model of helicopter engine and, pursuant to a procurement contract, sold that engine to the United States Army exclusively. *Id.* at *2. One of the defendants had delegated authority from the FAA, and "[a]n FAA employee/advisor closely supervise[d] the [delegate] to ensure it [was] performing its delegated functions" in accordance with FAA regulations, policies and procedures. *Id.* at *4. In a tort claim arising out of a helicopter crash, the court had federal officer jurisdiction, even though no individual employee was named as a defendant, because the corporation, as a military contractor, "was subject to monitoring and/or supervision by the federal authorities." *Id.* at *5.

These consolidated cases do not implicate work undertaken pursuant to a government contract, and Defendant was not subjected to the same level of monitoring and supervision as was the contractor defendant in *Scrogin*. Thus, *Scrogin* does not control the result here. *See also, Boyle v. United Technologies Corp.,* 487 U.S. 500, 506 (1988) (explaining that "civil liabilities arising out of the performance of federal procurement contracts" implicate a "uniquely federal interest").

Defendant's other supporting case is inapplicable. In *AIG Europe v. McDonnell Douglas Corp.,* No. 02 C 8703, 2003 WL 257702, at *1 (C.D. Cal. Jan. 28, 2003), the plaintiffs sued an airplane manufacturer for damages incurred in a plane crash. The plaintiffs

alleged that defendants "negligently failed to comply with the process for certifying" the aircraft. *Id.* at *2. The Court found that the defendant "was acting under a federal officer within the meaning of § 1442(a)(1) when the plane at issue was certified." *Id.* at *4. Here, in contrast, Plaintiffs do not assert negligent certification or any other defects in the certification process.

Defendant acknowledges this distinction, yet insists that there can be no challenge to airworthiness that is independent of certification. But Defendant cites no authority for that argument, and the Court is not persuaded that a suit against an airplane manufacturer for product liability and negligence is necessarily also a suit against the manufacturer's employees for negligent certification. Defendant might have been correct if federal aviation law preempted state tort law completely, but that is not the case – federal aviation law preempts state law only to the extent that the two conflict. *Vorhees v. Naper Aero Club, Inc.,* 272 F.3d 398, 405 (7th Cir. 2001); *see also, Britton v. Rolls Royce Engine Servs.,* No. 05 C 1057, 2005 WL 1562855, at *4 (N.D. Cal. June 30, 2005) (remanding where the complaint did not name any individual defendants, did not specifically identify the defendant as a federal officer, and did not allege that the defendant's issuance of an airworthiness certificate was a proximate cause of the accident).

Finally, Defendant appears to argue that it was "acting under the United States" because it is an FAA delegate – apparently, the FAA has authorized Boeing to act as its representative in performing delegated functions, including certification functions. The phrase "acting under" is construed liberally. *Watson v. Philip Morris Cos.,* 551 U.S. 142, 147 (2007). However, Defendant does not cite – and the Court could not find – any case that upheld federal officer jurisdiction on the ground that the corporation itself is the federal officer; in fact, Courts appear to go the other way. *See*, *O'Brien v. Cessna Aircraft Co.,* No. 09-C-40, 2010 WL 4721189 (D. Neb. July 21, 2010). In *O'Brien,* the Defendant, Cessna Aircraft Co., was an FAA delegate, and pursuant to its delegation was "entitled to issue aircraft type certificates and police compliance with minimum standards." *Id.* at *6. The Court explained that the defendant-manufacturer could not remove simply because it was an FAA delegate. *Id.* at *13. Declining to reach a result that would allow every airplane negligence claim to end up in federal court, the Court held that it lacked jurisdiction under the federal officer removal statute. *Id.*

Ultimately, Plaintiffs have not challenged any of the actions taken under color of law. Defendant's defense of compliance with federal aviation regulations is insufficient to bring its rebuttal within the scope of "acting under a federal official." *Watson,* 551 U.S. at 153 (explaining that even close supervision and monitoring

of a private firm's compliance with federal rules and regulations does not permit removal on the basis of federal officer jurisdiction). Defendant's theory of this Court's jurisdiction would allow it to remove any case to federal court based on its status alone, but that idea conflicts with the purpose of federal officer removal: to protect federal officers only insofar as they are being sued for acts taken under color of their office. *Willingham v. Morgan,* 395 U.S. 402, 406 (1969). Accordingly, the Court lacks federal officer jurisdiction.

## IV. CONCLUSION

For the reasons stated herein, the Court lacks both admiralty and federal officer jurisdiction. The Motions to Remand are granted.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Date:12/16/2013